In the Matter of John A.
SHORTER, Jr.,

A Member of the Bar of the District of
Columbia Court of Appeals,
Respondent.

No. 85–1745.

District of Columbia Court of Appeals.

Submitted May 17, 1989.
Decided Feb. 21, 1990.

Before ROGERS, Chief Judge, and PRYOR and MACK, Senior Judges.*

PER CURIAM:

In 1985 a jury of the United States District Court for the District of Columbia convicted respondent John A. Shorter, Jr., a member of our bar, of one felony count of willful tax evasion, 26 U.S.C. § 7201 (1982), and six misdemeanor counts of willful failure to pay taxes, 26 U.S.C. § 7203 (1982 & Supp. V 1987).[1] On January 10, 1986, finding that respondent had been convicted of a serious crime within the meaning of Bar Rule XI, § 15(1), (4)[2] law, we accordingly referred the matter to the Board on Professional Responsibility with instructions to institute proceedings "for determination of the final discipline to be imposed" and "to review the elements of the crime for which Respondent was sentenced for the purpose of determining whether or not the crime involves moral turpitude within the meaning of D.C.Code § 11-2503(a) [(1989 Repl.)]."[3]

In his defense, respondent argues that his tax crimes were the product of a pathological gambling disorder, for which he should not be held responsible. A Hearing Committee of the Board on Professional Responsibility found insufficient causation between respondent's pathology and his legal difficulties to support this defense or to warrant its consideration in mitigation of sanctions. Concluding that his crimes violated disciplinary rules DR 1-102(A)(4) and DR 1-102(A)(5), *infra* page 767, but involved no moral turpitude, it refrained

---

* Judge Mack was an associate judge of the court at the time of submission. She was commissioned as a senior judge on December 1, 1989.

1. 26 U.S.C. § 7201 (1982) provides:
   Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 5 years, or both, together with the costs of prosecution.
   26 U.S.C. § 7203 (1982 & Supp. V 1987) provides in relevant part:
   Any person required under this title to pay an estimated tax or tax, or required by this title or by regulations made under authority thereof to make a return, keep any records, or supply any information, who willfully fails to pay such estimated tax or tax, make such return, keep such records, or supply such information, at the time or times required by law or regulations, shall, in addition to other penalties provided by law, be guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than $25,000 ($100,000 in the case of a corporation), or imprisoned not more than 1 year, or both, together with the costs of prosecution.

2. Rule VI, § 15(1) of the District of Columbia Court of Appeals Rules Governing the Bar provides:
   Upon the filing with the Court of a certified copy of the court record (e.g., docket entry showing verdict or finding) demonstrating that an attorney has been found guilty of a serious crime as hereinafter defined, the Court shall enter an order immediately suspending the attorney, whether the finding resulted from a plea of guilty or *nolo contendere* or from a verdict after trial or otherwise, and regardless of the pendency of an appeal, pending final disposition of a disciplinary proceeding to be commenced upon such finding. Upon good cause shown, the Court may set aside such order of suspension when it appears in the interest of justice to do so.
   Rule VI, § 15(4) provides:
   Upon the receipt of a certified court record of a guilty finding against an attorney for a serious crime, the Court shall, in addition to suspending him in accordance with the provisions of paragraph (1) above, also refer the matter to the Board for the institution of a formal proceeding before a hearing committee, in which the sole issue to be determined shall be the nature of the final discipline to be imposed, provided that a disciplinary proceeding so instituted will not be brought to hearing until all appeals from conviction of the crime are concluded.

3. D.C.Code § 11-2503(a) reads in relevant part:
   When a member of the bar of the District of Columbia Court of Appeals is convicted of an offense involving moral turpitude, and a certified copy of the conviction is presented to the court, the court shall, pending final determination of an appeal from the conviction, suspend the member of the bar from practice.... If a final judgment of conviction is certified to the court, the name of the member of the bar so convicted shall be struck from the roll of the members of the bar and he shall thereafter cease to be a member.

from recommending his disbarment. Instead, as a lesser sanction, it recommended his suspension from the practice of law for a period of four years effective *nunc pro tunc* to the date of his original temporary suspension by this court. The full Board, however, while adopting the Hearing Committee's factual findings, has now submitted a report recommending respondent's disbarment with a five year suspension dating from the original temporary imposition of that sanction. Based on the record and findings of the Hearing Committee and the Board, we conclude that respondent violated DR 1–102(A)(4), and we adopt the Board's recommendation of disbarment, effective *nunc pro tunc* to January 10, 1986, the date of his initial temporary suspension.[4]

## I. FACTS

Respondent is a highly regarded member of our criminal defense bar. In sentencing him for tax offenses, the federal district judge described him as "an attorney who enjoys [the] great esteem of the Bench and Bar," "a fine lawyer learned in the law," and "an excellent trial lawyer" who has often done professional work *pro bono*. In like manner, the Hearing Committee reported that "[t]here has never been any suggestion that Respondent has ever, in his relationships with his clients and the judicial system, demonstrated anything other than the highest standards of diligence and integrity."

---

4. We take this opportunity to thank the Board, the Hearing Committee, and Bar Counsel for their thorough marshalling of complicated facts and their thoughtful exegesis on the issues presented. The reports and briefs submitted by all counsel involved have been most helpful to the court.

5. On one occasion, we upheld a judgment finding respondent in contempt for failing to make timely appearance in court. *In re Shorter,* 236 A.2d 318 (D.C.1967). As this finding is remote in time and subject matter, and the offense has apparently not been repeated, we do not consider it as compounding the infractions involved in this case or otherwise affecting the factors relevant to our decision.

6. Later, in 1977, respondent pled guilty to a charge of failure to pay District of Columbia taxes. This conviction apparently did not lead to separate disciplinary action.

Notwithstanding these professional virtues, the district judge also characterized respondent as "a notorious and long-time tax evader," who "has hardly paid any tax for the twelve years of the indictment, and not much more in the preceding eleven." In fact, this is not the first time that our court has been called upon to discipline respondent for tax-related offenses.[5] From 1965 to 1969 he filed no tax returns, and in 1974 he pled *nolo contendere* on federal charges of willful failure to file an income tax return.[6] As a result of these infractions, by unpublished opinion, we ordered his suspension for six months.

Respondent asserts that his earlier tax troubles did not teach him "a complete lesson":

> What I learned from that lesson is that you should file returns, but I didn't take the additional step. From that point on I filed returns and I filed honest returns, [but] I failed to pay taxes. So I corrected the mistake that I was making, but I created another mistake when I started filing returns but not paying the taxes and it wasn't that I had any criminal intent in mind for the taxes. When the tax returns were prepared every April 15th for every year that's involved, I didn't have the money to pay the taxes.

The reason respondent "didn't have the money," as the Internal Revenue Service would eventually learn, was that, to protect himself against his own gambling habit,[7]

---

7. The evidence shows that respondent's gambling started in 1942, when, at the age of fourteen, he began playing cards and shooting dice. He continued gambling, with varying degrees of intensity, through college, military service, and law school. During 1963 and 1964 he gambled, and soon began restructuring his work schedule so that he had afternoons off to bet on horses. When the Atlantic City casinos opened up, he began travelling there on weekends to gamble, and in the 1970s and 1980s, he went to the track every possible weekday. Although respondent maintained a checking account in the early 1950s, he ceased to maintain this account sometime between 1954 and 1956 because he found that, as a result of his gambling, he was having difficulty covering checks. Respondent testified that at that time he had no tax problems, and his lack of a checking account bore no relation-

respondent had long earlier adopted a "cash lifestyle": he had no bank or checking accounts, no credit cards, no real property or automobiles, and no personal assets. All of his expenses were paid by his firm from accounts held solely in the name of his law partner, Bernadette Gartrell.

The matter before us arises from respondent's 1985 federal conviction for failure to pay income taxes from 1972 through 1983. According to the Hearing Committee's figures, of $134,866.40 in federal taxes due for that period, respondent paid $2,536.40.[8] When, in the course of tax collection efforts dating from 1975 to 1980, IRS agents took signed financial statements from respondent based on oral interviews, he informed them that he lacked any personal assets. At the criminal trial, Agent Vernon Rippen testified that when, at an April 1975 interview with respondent, he asked "if he had any bank account or any interest in any bank account ... he replied no." When asked if respondent had "any other assets like trailers, boats, horses, that type of thing," he again "replied no...." The form Rippen used in taking this statement did not include a question about partnership interests.

Similarly, when Agent Vito Acquaviva met with respondent to take another financial statement, he asked him if "he had cash in a bank account or a savings account or any other financial institution," and respondent answered that "[h]e had no accounts whatsoever." When, referring to the inclusion of respondent's name in the name of his law firm ("Mitchell, Shorter and Gartrell"), Acquaviva inquired about his interest in the firm, respondent replied that he only had an office sharing arrangement with Gartrell, to which she had agreed in a spirit of generosity. Acquaviva also claimed that when asked how he

was able to pay his expenses, respondent explained that "Ms. Gartrell allowed him to use the offices until such time as he was able to meet his expenses and that she was doing this out of the goodness of her heart." (In testifying before the Hearing Committee, respondent denied that he had made the last of these remarks.) Although respondent informed Acquaviva that he intended to send money to the IRS, he failed to do so. When Acquaviva served a notice of levy on respondent's law firm, respondent requested that no further notices be sent to the firm, and after again making a financial statement denying that he possessed any assets, entered into a written agreement to make monthly payments to the IRS of $200.00. These payments were never made.[9]

As one IRS agent admitted during the criminal trial, respondent's statements about his personal assets were technically true. Respondent's testimony before the Hearing Committee illustrates this:

> A. [W]hat was under discussion were my personal taxes and the agents were attempting to ascertain what my assets were in order to collect the taxes. And after talking to them I explained to them that I had no assets. They were concerned about automobiles, real estate, money in the bank, bank accounts and other assets; and I explained to them I didn't have any assets.... [T]hey would ask me, did I have a bank account and I would say no, I had no bank account. Did I have an automobile[?] I had no automobile. Had stocks and bonds[?] [N]o. Do you have any life insurance[?] No, I didn't have any life insurance.

> \* \* \* \* \* \*

> Q. Did they ever ask you whether you have a partnership bank account?

---

ship to his future tax problems. He denied that he had had a role in deciding his law firm's subsequent financial arrangements, described below, and he specifically denied making these arrangements for tax evasion purposes.

8. Bar Counsel indicates that at the time of sentencing respondent
  owed the Federal Government over a quarter of a million dollars, including interest and penalties of which he had paid approximately

$6,000. In addition, he owed the District of Columbia Government approximately $70,000 which he had paid, approximately $5,000.00. Brief of Bar Counsel before the Board on Professional Responsibility, Hearing Committee Number One, at 14 (filed April 11, 1988).

9. Other signed financial statements were secured in 1979 by Agent Dorothy Spivacke and in 1980 by Agent George H. Howe, also indicating that respondent completely lacked cash, personal assets or bank accounts.

A. You see the questions were put to me on the basis of what did I have.

Q. Individually.

A. Individually, yes. As far as any cash on hand, bank accounts and any other assets.

When the Hearing Committee asked respondent whether he could have informed IRS agents about the amount and sources of his income if had wanted to do so, he replied:

A. If I had been thinking in that vein and if they had asked me, yes. First off, I answered the questions that they asked me and I didn't attempt to conceal anything and I dealt with the man in a straightforward fashion[.] He knew that I was an attorney, he knew that I was practicing law and they were concerned with what it was that they could seize[,] like cash, automobiles, real estate, stocks and bonds and things of that nature.

Q. But you knew that if you said to them[,] look fellows, you've asked me all these questions but you haven't asked me the right questions[;] if you ask me if the fact is that I've got X thousands of dollars coming in from fees and I turn it over to my partner and she puts it in this bank account and I draw it out, that kind of information you knew would have been of interest to them, right?

A. Yes, I'm sure that would have been of interest to them. If I thought that was the information that they were seeking, I would have told them that.

Q. The sense that I'm getting from it, sir, is that you're an experienced criminal lawyer[;] the government came to you to ask you questions and what went through your mind was[,] I'll answer the questions like I'll advise a client to answer questions, give a responsive answer and that's it.

\* \* \* \* \* \*

A. The way I was dealing with them was[,] they came to me to ask me about my taxes and about my assets and I answered the questions. I didn't conceal anything, I wasn't playing any games with them, I wasn't trying to hide anything. If they had asked me or if the subject had come up about how do I get my pay, I would have told them that I get paid at that point in time through checks that come through the firm. ... [M]y way of looking at it was to tell them what I personally had, whether it had been bank accounts, checks, cash or whatever and it wasn't done with an idea of saying well I'll play this game with them or I'll conceal this or I'll conceal that.

Before the Hearing Committee, respondent's law partner, Gartrell, testified that she had held two firm bank accounts in her own name and had been told by respondent not to put his name on the accounts. She admitted to some knowledge about his tax liabilities, and explained that she had assumed that respondent had kept his name off the accounts to prevent those liabilities from interfering with the operation of the office. Respondent testified that Gartrell had acted in these matters solely at her own initiative, and he denied that the accounts had been set up in her name to avoid the payment of taxes. Respondent, who was a fifty-percent partner in the firm and its primary source of business, knew of Gartrell's handling of the account and did not interfere in it. When, in 1980, the IRS issued a summons to one of the banks where the firm maintained an account and sought account records, Gartrell demanded that the bank not comply, leading to litigation that eventually resulted in the enforcement of the summons. Respondent told the Hearing Committee that he was aware of Gartrell's efforts to oppose the summons but felt that he could not direct her to cooperate with the IRS because the matter was within her area of responsibility at his law firm.

The Hearing Committee considered expert testimony offered by both sides relating to respondent's alleged gambling pathology, and its asserted causal—and thus exculpatory or mitigating—relationship with his tax offenses. These issues, and the evidence relating to them, are discussed in greater detail below. The Hearing Committee declined to find the requisite degree of causation to absolve respondent of the misconduct charged, but considered his gambling pathology as a mitigating factor

in recommending a lesser sanction, the four year suspension, than that sought by Bar Counsel. Relying on *In re Kersey*, 520 A.2d 321 (D.C.1987), the Board rejected only the Hearing Committee's use of the pathology as a mitigating factor, and recommended his disbarment, as Bar Counsel had requested.

## II. MORAL TURPITUDE

■ We agree with the findings of the Hearing Committee and the Board that respondent's crimes did not involve moral turpitude within the meaning of D.C.Code § 11–2503(a). In applying this provision, we must first determine whether respondent's crimes were *per se* acts of moral turpitude, i.e., whether any of their underlying elements inherently included a component of moral turpitude. *In re Colson*, 412 A.2d 1160, 1164–67 (D.C.1979); *see also In re Hallinan*, 43 Cal.2d 243, 247–50, 272 P.2d 768, 771–72 (1954) (allowing summary disbarment for crime inherently involving moral turpitude, but requiring hearing on issue of moral turpitude if underlying conviction was possible on facts not involving moral turpitude). An affirmative answer to this question completes our inquiry; regardless of the particular facts of the case, disbarment is mandated. *Id.* If, however, we do not locate moral turpitude within the elements of the crime, we must still inquire whether respondent's conduct, on the particular facts of the case, involved moral turpitude. *Id.* at 1165. Having undertaken each of these investigations, we are satisfied that neither the crimes themselves nor the particular acts involved in their commission descended to the level contemplated by D.C.Code § 11–2503(a).

As we explained in *Colson*, a crime involves moral turpitude if "the act denounced by the statute offends the generally accepted moral code of mankind." *Id.* at 1168. It involves "baseness, vileness or depravity in the private and social duties which a man owes to his fellow men or to society in general, contrary to the accepted and customary rule of right and duty between man and man." *Id.* (quoting 2 BOUVIER'S LAW DICTIONARY 2247 (Rawle's Third Revision)). It includes "[c]onduct contrary to justice, honesty, modesty or good morals." *Id.* (quoting BLACK'S LAW DICTIONARY 1160 (4th ed. 1951)). As one court has written:

> The "moral turpitude" that may be involved in a crime does not exist merely because there has been a crime, a violation of law. In a sense, it is immoral to violate any law, even a traffic ordinance, but here the words "involving moral turpitude" clearly suggest something much more serious, for otherwise they are pure surplusage. The "moral turpitude" must exist entirely apart from the fact that some statute has been violated. If a crime is one involving moral turpitude it is because the act denounced by the statute grievously offends the moral code of mankind and would do so even in the absence of a prohibitive statute.

*United States v. Carrollo*, 30 F.Supp. 3, 6 (W.D. Mo.1939). In addition, the concept has commonly been found to involve intentional dishonesty for personal gain.[10] *In re Kent*, 467 A.2d 982, 984 (D.C.1983); *Hallinan, supra*, 43 Cal.2d at ——, 272 P.2d at 771.

The crimes we have caused to be examined are willful failure to pay taxes, 26 U.S.C. § 7203, and willful tax evasion, 26 U.S.C. § 7201.

---

**10.** In this regard, we endorse what the Hearing Committee has emphasized in its report on this case to the Board on Professional Responsibility:

> [I]n the tax evasion area, requiring the element of deceit for a finding of moral turpitude makes sense. Tax codes are extraordinarily complex, and taxing authorities recognize that tax *avoidance*, as opposed to tax *evasion*, is perfectly lawful behavior. Indeed, large segments of the legal, accounting, and business profession are openly dedicated to the design and implementation of ingenious

schemes to structure personal and business transactions and assets in such a way as to avoid tax payments. In this environment, there is a difference between traditional common law property crimes of fraud and theft, aimed at victimizing either a private party or the government, and a tax crime, which entails stepping over a line not always clearly demarcated. Deceit, on the other hand, is a clear line which persons of honest morals and good character know not to cross, whether dealing with tax authorities or anyone else.

We conclude, first, that section 7203, whose elements are willfulness and non-payment of a tax when due, *Sansone v. United States*, 380 U.S. 343, 351, 85 S.Ct. 1004, 1010, 13 L.Ed.2d 882 (1965), does not, *per se*, comprise a crime of moral turpitude. Certainly, merely negligent nonpayment of the tax, without more, would not justify classification as an act of moral turpitude. While the additional element of "willfulness," for purposes of the law, must include "some element of evil motive and want of justification in view of all the financial circumstances of the taxpayer," *Spies v. United States*, 317 U.S. 492, 498, 63 S.Ct. 364, 368, 87 L.Ed. 418 (1943), the intensity of the evil does not rise to a level of "baseness, vileness or depravity" sufficient to reach the condition of moral turpitude. Rather, "evil motive," in this sense, denotes an intention to do harm, whether or not the underlying intent is "depraved." *See, e.g., United States v. Rhoads*, 48 F.Supp. 175, 176 (D.D.C.1942) ("it is an evil, a wrong of grievous character, to frustrate a Government function"); 32A C.J.S. *Evil* (1964) ("Having harmful qualities or characteristics; productive of, or attended by, harm or injury; hurtful to the body, mind, or feelings; effecting mischief, trouble, or pain; bad."). Although we must naturally question the scruples of anyone who would intentionally thwart the collection of taxes he owed, we cannot fairly say that one who commits this "evil" is "vile." While this evil, like that in *Rhoads*, impairs governmental objects, its motivation is mere selfishness without any further abhorrent intention, such as would characterize a calculated attempt to harm others for the sake of the harm.

Similarly, we conclude that section 7201, which requires the additional element of evasion, *Sansone, supra*, 380 U.S. at 351, 85 S.Ct. at 1010, does not, *per se*, involve an act of moral turpitude. The underlying harm remains the same, as does the requisite degree of intent, willfulness. *Spies, supra*, 317 U.S. at 498, 63 S.Ct. at 367. For purposes of section 7201, an "affirmative act" remains undefined, but has been illustrated as consisting of such conduct as keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal.

*Id.* at 499, 63 S.Ct. at 368. While a willful, affirmative act of evasion is more serious than a willful failure to pay taxes, we do not believe that it can be said that such an evasion offends basic moral precepts common to humanity. As the court stated in *Carrollo, supra*, 30 F.Supp. at 7:

> We are not prepared to rule that an attempt to evade the payment of a tax due the nation, or the commonwealth, or the city, or a school district, wrong as it is, unlawful as it is, is an act evidencing baseness, vileness, or depravity of moral character. The number of men who have at some time sought to evade the payment of a tax or some part of a tax to a taxing authority are legion. Any man who does that should be punished civilly or by criminal sentence, but to say that he is base or vile is to misuse words.

We are satisfied, therefore, that neither offense was, *per se*, a crime of moral turpitude.

■ We also find that the specific acts underlying the charges did not necessarily include conduct involving moral turpitude. The indictment charged respondent with three affirmative acts of tax evasion: (1) "concealing and attempting to conceal from the Internal Revenue Service the existence and amount of his available monies"; (2) "making false statements to agents of the Internal Revenue Service"; and (3) "placing his funds beyond the service of process." In convicting respondent, the jury was required only to find a single affirmative act of evasion, without specifying which of the three alleged acts of evasion it relied upon in finding respondent guilty. To the extent that we are unable to determine which of these affirmative acts the jury found appellant to have committed, we may only sanction respondent to the extent required by those actions which would be

minimally necessary to sustain the underlying convictions.[11]

Respondent's "cash lifestyle" and any actions which have frustrated the IRS in its efforts to collect the taxes he owed have been described above. His interaction with IRS agents has also been explored. It is not obvious that he ever affirmatively lied in dealing with the IRS; he merely gave them the information they requested, and nothing more. He had organized his finances in such a way that his available resources were difficult to trace, but honestly reported his income in yearly tax returns. Because we do not know whether the jury predicated his conviction of tax evasion on any affirmative act more duplicitous than "placing his funds beyond the service of process," and because we cannot establish that he actually took steps to conceal information or made false statements, we cannot say that he practiced deception. *See Kent, supra,* 467 A.2d at 984; *Hallinan, supra,* 43 Cal.2d at 247, 272 P.2d at 771. Nonetheless, he willfully committed crimes which he could be expected to know would result in preventing the retirement of his acknowledged tax liability. While this was legally and ethically blameworthy, it cannot be described as either depraved or deceitful on these facts. We therefore cannot say that respondent's particular actions in violating 26 U.S.C. §§ 7201 and 7203 involved moral turpitude.

### III. VIOLATIONS OF DISCIPLINARY RULES

Although we conclude that respondent's conduct involved no moral turpitude, it did include serious crimes and violated DR 1-102(A)(4). Contrary to the Board's conclusion, we find no violation of DR 1-102(A)(5).

#### A. *Alleged Violation of DR 1-102(A)(4)*

█ In pertinent part, DR 1-102(A)(4) provides that "[a] lawyer shall not ... [e]ngage in conduct involving dishonesty, fraud, deceit, or misrepresentation." Although it found no deceit for purposes of assigning moral turpitude to respondent's conduct, the Hearing Committee recommended sanctioning respondent under DR 1-102(A)(4). We agree that respondent violated this provision and predicate our invocation of sanctions, in part, on this violation.

Any facial inconsistency between our holding as to moral turpitude and as to the applicability of DR 1-102(A)(4) dissipates under close scrutiny. Notably, the conduct prohibited by DR 1-102(A)(4) may fall into one of four separate categories disjunctively stated: "dishonesty, fraud, deceit, or misrepresentation." We agree with the Hearing Committee and the Board that these four terms should be understood as separate categories, denoting differences in meaning or degree. Thus, to the extent possible, each term should be read narrowly, so as not to engulf any of the remaining three. Moreover, if any term proves more general than the others, or encompasses another, only the more general term need be applied: we will find only one violation of the disciplinary rule upon a single set of facts.

The most general term in DR 1-102(A)(4) is "dishonesty," which encompasses fraudulent, deceitful, or misrepresentative behavior.[12] In addition to these, however, it

---

11. *See Hallinan, supra,* 43 Cal.2d at 247-50, 272 P.2d at 771-72. The court held:

Only when an attorney is indicted for a crime the commission of which would in every case evidence a bad moral character, is the issue of moral turpitude tendered in the criminal trial. If an attorney could be summarily disbarred after conviction for a crime, the minimum elements of which do not involve moral turpitude, he would never have an opportunity to be heard on the issue on which his disbarment depends. We must assume that every jury in a criminal trial is properly instructed to convict the defendant if they find the mini-

mum elements of the offense charged, and it would be mere speculation to conclude in any case that a jury finds a defendant guilty of conduct alleged in the indictment, proof of which is unnecessary to his conviction, merely because the jury brought in a verdict of guilty.

43 Cal.2d at 249, 272 P.2d at 772.

12. The encyclopedia definitions of fraud, deceit and misrepresentation demonstrate their more specific meanings. "Fraud is a generic term which embraces all the multifarious means ... restorted to by one individual to gain an advan-

encompasses conduct evincing "a lack of honesty, probity or integrity in principle; [a] lack of fairness and straightforwardness...." *Tucker v. Lower,* 200 Kan. 1, 4, 434 P.2d 320, 324 (1967). Thus, what may not legally be characterized as an act of fraud, deceit or misrepresentation may still evince dishonesty.

■ Given the "technically true" nature of respondent's answers to questions posed by revenue agents, and his abstinence from actual false statements or affirmative acts of concealment, we decline to describe his financial arrangements and his parsimonious dissemination of information as either fraudulent, deceitful, or misrepresentative, which all describe degrees or kinds of active deception or positive falsehood. *See supra* note 12. We deem this issue a close one, however, and thus experience no difficulty in characterizing these arrangements as evincing a lack of integrity and straightforwardness, and therefore dishonest. By his own acknowledgment respondent knew what information the IRS was after, but for his own benefit refrained from supplying that information even when asked questions that grazed the truth. As long as the IRS did not ask just the right questions, respondent was prepared to deprive it of the right answers. This conduct was of a dishonest character, and thus violated DR 1–102(A)(4).

### B. *Alleged Violation of DR 1–102(A)(5)*

■ DR 1–102(A)(5) encompasses "conduct prejudicial to the administration of justice." Bar Counsel amended its petition to the Board on Professional Responsibility to include this charge against respondent on the grounds that his misconduct "interfered with the government's functions of collecting taxes."

Respondent contends that conduct "prejudicial to the administration of justice" is properly limited to conduct which either taints or improperly interferes with the decision-making process of a tribunal. *See In re Reback,* 487 A.2d 235, 239 (D.C.1985) (DR 1–102(A)(5) bars conduct leading to erroneous decisions or which taints the decision-making process); *In re Keiler,* 380 A.2d 119, 125 (D.C.1977) (similar). Here, respondent's misconduct did not bear directly upon any decision or the decision-making process of any tribunal.

■ While admitting the merit of this approach, and that "[r]espondent's conduct had no impact on the decision-making process of any tribunal," the Board contends that we are not writing on a clean slate, and must abide by our prior holdings in two unpublished opinions, *In re King,* S–46–76/R–10–77 (D.C., Nov. 18, 1976), and *In re Rigby,* S–45–76/R–11–77 (D.C., Sept. 16, 1977), in which we held that willful failure to file tax returns constitutes conduct prejudicial to the administration of justice. We explained in those opinions that a lawyer's failure to discharge an obligation might shake public confidence in the legal system. Obviously, however, a lawyer's failure to abide by any canon, disciplinary rule or ethical consideration might have the same effect. Like the Board itself, we doubt that the drafters of the rule ever intended by virtue of DR 1–102(A)(5) to convert one information into two, and we see the merit of respondent's narrower interpretation of the rule. This is consistent with our holdings in *Reback, supra,* and *Keiler, supra,* to the effect that DR 1–102(A)(5) was drafted to protect the integrity of particular decisions and of the decision-making process, and thus was directed against an attorney's efforts to subvert that process respecting a particular identifiable case or tribunal. But, since the unpublished decisions cited by the Board are binding on this division, and thus have precedential value, we would be constrained to hold, under ordinary circumstances, that respondent violated DR 1–

---

tage over another by false suggestions or by suppression of the truth." 37 C.J.S. *Fraud* § 1 (1943). "[Deceit is t]he suppression of a fact by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact," 26 C.J.S. *Deceit* (1956), and is thus a subcategory of fraud. "[Misrepresentation is] the statement made by a party that a thing is in fact a particular way, when it is not so; untrue representation; false or incorrect statements or account." 58 C.J.S. *Misrepresentation* (1948).

102(A)(5). Under the circumstances here, we decline to do so.[13]

## IV. THE PATHOLOGICAL GAMBLING DEFENSE

█ As a defense to the allegations of misconduct considered on this appeal, respondent urges that they were a product of his alleged gambling pathology, and that he should therefore not be held responsible for them. Alternatively, he requests that it be considered in mitigation of any sanction we impose, citing our prior holding, relating to the effects of alcoholism, in *In re Kersey, supra.*

The Hearing Committee heard extensive expert psychological testimony regarding respondent's gambling pathology. Dr. Jonas Rappeport, a psychiatrist called by respondent, testified that pathological gambling is a recognized mental disorder and diagnosed respondent as a pathological gambler. In a written psychiatric evaluation, Dr. Rappeport indicated that respondent's "inability to acquire any assets is clearly the result of . . . his gambling disorder, and in my opinion does not represent a purposeful attempt to evade paying taxes." Dr. Rappeport also wrote:

> I could find no evidence that he willfully established a position of no assets in order to evade paying his taxes. However, I have some difficulty accepting that his gambling compulsion was so severe that it prevented him at any time from acquiring sufficient funds to make some more reasonable attempt to pay his taxes.

While Dr. Rappeport believed that there was a causal link between pathological gambling and respondent's alleged misconduct, he acknowledged disagreement in the medical community about the causal relationship between the gambling pathology and associated criminal behavior. He also distinguished pathological gambling from alcoholism, since evidence exists that alcoholism includes a physiological component.

Respondent also called Dr. Joseph W. Ciarrocchi, a psychologist who saw respondent in sixty-five therapy sessions from February 1985 to April 1987. Dr. Ciarrocchi agreed that pathological gambling is a recognized disorder sometimes characterized by behavior like respondent's, including his cash lifestyle and the relinquishment of control over his finances. Dr. Ciarrocchi did not find respondent's occasional ability to use his money for nonnecessaries other than gambling inconsistent with his diagnosis of respondent as a pathological gambler, noting that pathological gamblers sometimes respond to environmental pressures or feelings of guilt in determining their spending patterns. While admitting that there is a lack of consensus on the causal relationship between pathological gambling and criminal behavior, and acknowledging a lack of knowledge about the temporal relationship between respondent's gambling and his alleged criminal behavior, Dr. Ciarrocchi said that he was convinced that respondent's cash lifestyle was caused by his pathology. He explained respondent's ability to maintain a successful law practice and a commensurate lifestyle as part of the syndrome feeding the financial and psychological needs of pathological gamblers. Further, while recognizing close parallels between pathological gambling and substance abuse, Dr. Ciarrocchi, like Dr. Rappeport, acknowledged physiological or similar differences. In particular, he observed the close relationship be-

13. Since two members of this division are of the view that the unpublished decisions cited by the Board are binding on this division, *see* D.C. App.R. 28(h) (1988) (unpublished opinions not to be cited except in limited circumstances, including a disciplinary action), in the interest of maintaining inviolate the rule of *M.A.P. v. Ryan,* 285 A.2d 310 (D.C.1971), we are proposing to the en banc court that it agree with us that, in the absence of conduct affecting the decision making process of any tribunal, the willful failure to file tax returns does not constitute a separate violation of conduct prejudicial to the administration of justice under DR 1–102(A)(5). This approach, employed in *Dupont Circle Citizens' Association v. District of Columbia Bd. of Zoning Adjustment,* 403 A.2d 314, 318 (D.C. 1979), facilitates *en banc* consideration of narrow issues. In this regard, we have asked the nondivision members of the court to examine the soundness of our position in rejecting the rationale of the unpublished decision. Each active judge has made a determination not to call *sua sponte* for an *en banc* vote on this issue.

tween substance abuse and the impairment of memory and cognitive faculties.

Finally, Bar Counsel called Dr. Neil Blumberg, a forensic psychiatrist. In a written report, Dr. Blumberg indicated that respondent did not fully meet the diagnostic criteria of a pathological gambler, stating, "I would describe the defendant's gambling as his *failing* to resist the impulse to gamble, as opposed to his being *unable* to resist the impulse to gamble." (Emphasis in original.) Further, he stated:

[A]lthough Mr. Shorter clearly had a problem with gambling, he dealt with this in a rather controlled manner and clearly made choices as to how he would spend the money available to him.... [T]he defendant would always take care of his basic living expenses, was generous with his friends when he had money available, and would spend a good deal of his money on expenses unrelated to his gambling activities.... [W]hen the time came to pay his tax liability, during which times the defendant had money in a partnership account of sufficient amount to cover this expense, he chose not to do so.

While he agreed with respondent's experts that no consensus existed regarding the causal links between pathological gambling and criminal behavior, he averred that a broad consensus did exist that pathological gambling was not a sufficiently severe disorder "that it would affect one's ability to formulate a specific intent to engage in willful behavior." Further, he stated that, unlike alcoholism, pathological gambling does not affect cognitive processes or the physiological functioning of the brain.

The principal disagreement between the experts called by respondent and Bar Counsel was in their diagnosis of and prognosis for respondent. Dr. Rappeport and Dr. Ciarrocchi agreed that respondent was a pathological gambler, and was either on the way to recovery or recovered. They both recommended participation in a Gamblers Anonymous program as an appropriate regime of therapeutic treatment. By contrast, Dr. Blumberg indicated that respondent was not a pathological gambler,

but suffered from a narcissistic personality disorder, and offered little hope of improvement. Dr. Blumberg did not suggest that the narcissistic personality disorder bore a causal relationship to respondent's failure to pay taxes.

The disagreement between the experts is partly resolved by standardizing the diagnostic criteria on which they relied. Dr. Blumberg relied in his testimony on the diagnostic criteria set forth in the Third Edition of the American Psychiatric Association's Diagnostic and Statistic Manual of Mental Disorders ("DSM III"), which describes pathological gambling as an inability to resist the gambling impulse. By contrast, Dr. Rappeport and Dr. Ciarrocchi relied on the more recent Third Revised Edition of the same manual ("DSM III–R"), which describes the same pathology not as an inability, but only a "[f]ailure to resist" the impulse to gamble. Indeed, when asked to apply the DSM III–R criteria, Dr. Blumberg acknowledged that respondent met the description of a pathological gambler.

Unfortunately for respondent, a failure to resist is something less than an inability to do so. It is precisely for failing to resist that respondent was prosecuted, and is now to be sanctioned. If respondent had established that he could not resist, we would be inclined to consider his gambling pathology as a defense, provided he could also provide a further causal link between the illness and his sanctionable non-gambling behavior. Of course, that non-gambling behavior would have to meet the "but for" test or the "substantial contributing factor" test set out in *Kersey, supra,* in order to even merit consideration as a factor in mitigation of sanctions.

Here, respondent has provided neither causal link. His own experts admit that he could exercise a degree of choice in disposing of his financial resources, and indeed, their diagnosis of respondent's psychological condition appears to be dependent on criteria permitting this proviso. Bar Counsel's expert strongly corroborates this element of freedom in respondent's choices. Moreover, none of these experts could aver

a firm, uncontroversial link between respondent's pathology and his criminal behavior. Under these circumstances, we are unable to treat respondent's pathological problem either as a defense or as a mitigating factor in considering his sanctionable actions.

## V. SANCTION

█ Respondent has violated DR 1–102(A)(4) but has committed no crime involving moral turpitude. In determining the appropriate sanction to impose on respondent, we weigh the seriousness and continuing nature of his offenses against their negligible bearing on his relationship with his clients and the court, and against the fact that respondent has long proven an effective and valued advocate for the needy and underrepresented in our community.

We recognize that respondent has already served substantial time in prison for willful tax evasion and willful failure to pay taxes, and stands cleared of the most serious asserted ground for sanctions, crimes involving moral turpitude. He also stands cleared of sanctionable misconduct under DR 1–102(A)(5). On the other hand, this is not the first time we have been called upon to impose sanctions upon respondent for tax offenses. We are disappointed that he did not "learn a complete lesson" from his prior six-month suspension for failing to file returns, and we are disheartened to see a continuation of what must candidly be considered a pattern of dishonest dealing.

We must therefore conclude that respondent's conduct requires a serious sanction, and we accept the Board's recommendation of disbarment with probationary terms. Accordingly, we order that respondent be disbarred, effective *nunc pro tunc* to January 10, 1986, the date on which his initial temporary suspension commenced pursuant to an order entered in accordance with D.C.Bar R. XI, § 15.

*So ordered.*

MACK, Senior Judge, separate statement:

I am pleased that this division takes steps to avoid the conversion of one infraction into two. *See supra* n. 13. I take issue with my colleagues, however, when they summarily conclude that unpublished decisions cited by the Board require us to do what is antipathetical to basic constitutional considerations [1] and to the probable intent of the drafters of our rules.

It is precedent *sub silentio—i.e.,* established by long practice, that our unpublished opinions are not *stare decisis.* In this regard, *see* D.C.App.R. 28(h), prohibiting the citation of unpublished opinions or orders in briefs except, *inter alia,* in a criminal action or proceeding involving the same defendant, or in a disciplinary action or proceeding. This broad exception to our rule against the citation of unpublished opinions, in the disciplinary context, is explainable. Since our standard of review for Board recommendations (*see* Rule XI § 7(3)) mandates that "we enforce a general sense of equality in the sanctions handed out" (*see In re Smith,* 403 A.2d 296, 303 (D.C.1979)), the exception was undoubtedly provided to permit counsel to offer comparisons with like cases for the purposes of determining appropriate sanctions. As a consequence, it has become common practice for Bar Counsel and others involved in disciplinary proceedings to cite our unpublished opinions as persuasive authority. The permission to cite such unpublished opinions, however, does not render them binding upon the court. Certainly none of our disciplinary cases can be read as holding that an unpublished opinion or order is binding precedent.[2]

As a division member, I would not read our rule as authorizing the treatment of unpublished opinions as *stare decisis.* Cer-

---

1. Disciplinary proceedings are quasi-criminal in nature and an attorney involved therein is entitled to due process safeguards. *In re Williams,* 464 A.2d 115, 118–19 (D.C.1983).

2. Significantly, in *In re Roberson,* 429 A.2d 530 (D.C.1981), the en banc court cited an unpublished decision which it simultaneously ordered published.

tainly where the Board, as here, has expressed justifiable reservations about the disposition of our prior unpublished opinions, I would not treat them as even persuasive. Rather to avoid future confusion, I suggest that this matter be flagged for the attention of the full court, sitting in an administrative capacity.