In re Barry C. STILLER, Respondent,

A Member of the Bar of the District of Columbia Court of Appeals.

No. 95–BG–909.

District of Columbia Court of Appeals.

Argued May 7, 1997.

Decided Feb. 25, 1999.

Earl J. Silbert, with whom Charles B. Wayne, Washington, DC, was on the brief, for respondent. Steven C. Tabackman, also entered an appearance for respondent.

Leonard H. Becker, Bar Counsel, with whom Wallace E. Shipp, Jr., Deputy Bar Counsel, was on the brief, for petitioner, the Office of Bar Counsel.

Before WAGNER, Chief Judge, TERRY, Associate Judge, and PRYOR, Senior Judge.

TERRY, Associate Judge:

In early 1987, respondent Stiller, a member of our bar, received a legal fee of $135,-000 for the defense of a client in a federal drug case. The fee was paid in cash. He subsequently made a series of bank deposits, also in cash, in amounts of less than $10,000 each, thereby evading statutory requirements imposed on banks to report large currency transactions. The Board on Professional Responsibility ("the Board"), in Bar Docket No. 430–88, concluded that Mr. Stiller had acted dishonestly in violation of Disciplinary Rule (DR) 1–102(A)(4), and Bar Counsel recommended accordingly that he be publicly censured for engaging in dishonest conduct. Before this court Mr. Stiller claims that his actions were not dishonest because he was unaware that structuring bank deposits was a crime, and because he had no duty to disclose to the government that he had received a sizable cash legal fee.

Mr. Stiller was also charged with several other instances of misconduct in Bar Docket Nos. 159–89, 317–92, 538–92, 85–94, and 298–95. Those cases involved, *inter alia*, neglect and failure to provide competent representation, intentional failure to seek the lawful objectives of a client, and attempting to influence a juror by improper means.[1] With respect to those five cases, the Board has recommended that he be suspended for one year and demonstrate fitness as a condition of reinstatement, and that he make restitution to his clients in two of those cases. Mr. Stiller has not challenged either the Board's findings of fact in the other five cases or its recommended sanction; accordingly, we adopt the Board's recommendation, suspend him for a year, and direct that he make restitution. That sanction, however, does not encompass the Board's finding of a violation in Bar Docket No. 430–88 (the subject of this opinion), which Mr. Stiller ardently contests. Thus, even though the Board tells us that its recommended sanction in the other five cases "would be the same regardless of whether this particular violation had been found," we must still decide whether Mr. Stiller engaged in "dishonest" conduct within the meaning of the rule. We conclude that he did not.

1. On July 26, 1995, after receiving a copy of an order from the United States District Court for the District of Columbia suspending Mr. Stiller, this court also suspended him pending final resolution of these six disciplinary proceedings.

## I

Mr. Stiller has been a member of the District of Columbia Bar since 1969 and has been in private practice since 1975. Approximately sixty percent of his practice has consisted of defending persons charged with ordinary street crimes.

Fernando Luna was one of Mr. Stiller's clients in the mid–1980s. In early 1987, Luna's uncles, Eliezer and Diego Hoyos, were indicted for drug trafficking in the United States District Court for the Eastern District of Virginia. Luna retained Stiller to represent them. Mr. Stiller, together with local Virginia counsel, ultimately represented Eliezer Hoyos only. The legal fees for Mr. Stiller and the other attorneys who were to assist him in the defense of Eliezer were to be paid by the Hoyos family in Colombia; Gilberto Hoyos, a brother of the defendants, was to arrange for payment.

Because Mr. Stiller preferred that the payment be made by wire transfer rather than cash, he asked his secretary to obtain information about wire transfers from two local banks, Riggs National Bank and National Savings and Trust Company (NS & T). Eliezer Hoyos advised Mr. Stiller that he was reluctant to use a wire transfer, and Gilberto Hoyos told him that the legal fees would have to be paid in cash.[2] Stiller apparently acquiesced, for between January 30 and early March 1987, the Hoyos family delivered $135,000 in cash[3] to Mr. Stiller in three separate payments of $20,000, $25,000, and $90,000. Stiller was aware, through conversations with other criminal defense lawyers, that a deposit of more than $10,000 in cash would cause the bank to file a report of the transaction with the federal government which might result in forfeiture of the legal fees. In his testimony before the hearing committee, Mr. Stiller claimed that another reason for making deposits of less than $10,-000 was that evidence of a large cash fee might be used against his client at trial.

Mr. Stiller opened a special escrow account in his own name at NS & T to receive the Hoyos fees. From early February to mid-April 1987, he deposited in that account approximately $90,000 of the money he had received, in twelve separate deposits ranging in amounts from $750 to $9,000. The rest of the money from the Hoyos family was paid by Mr. Stiller directly to the other attorneys involved in the case, to third parties who provided services in connection with the representation, and to the operating account of Mr. Stiller's law firm.

Mr. Stiller claimed that he was unaware of any law at the time that made it a crime to make bank deposits in amounts of less than $10,000 for the purpose of evading statutory bank reporting requirements. He asserted that it was not until February or March 1989, about two years later, that he first learned from another attorney that there was such a statute. That attorney also informed Stiller of the need to file a Form 8300 with the Internal Revenue Service (IRS),[4] which he later filed.

This matter came to the attention of the disciplinary authorities in November 1988 when Eliezer Hoyos, now represented by a new attorney, filed a complaint with Bar Counsel. Hoyos alleged that Mr. Stiller had failed to account for some of the legal fees and had not earned the portion of the fees that were paid to his firm. In July 1987, Fernando Luna, on the advice of counsel, had surreptitiously tape-recorded a conversation with Mr. Stiller at his law office. In that conversation Stiller told Luna that he was structuring the payments so as not to deposit more than $10,000 at one time: "we couldn't put more than ten thousand dollars in the bank at a time, only 9900, so that ... we

---

2. Although there was conflicting evidence at the hearing, the hearing committee credited Mr. Stiller's testimony that the proposal to pay the fees in cash originated with Luna, and that Stiller made known his objection to a cash payment and his preference for a wire transfer.

3. There was a dispute in the testimony about whether the amount was $135,000 or $150,000,

but the hearing committee found, and we agree, that this dispute was not material.

4. Form 8300 is required to be filed by persons who, in the course of their trade or business, receive cash payments in excess of $10,000. *See* 26 U.S.C. § 6050-I (1994).

wouldn't have to report it to the government. So we wouldn't have his funds seized ...."

After an investigation, Bar Counsel charged Mr. Stiller with violating DR 1–102(A)(3) (which prohibits conduct involving moral turpitude) and DR 1–102(A)(4) (which prohibits conduct involving dishonesty) when he structured the bank deposits in amounts of less than $10,000 each in order to avoid triggering the bank reporting requirements. Bar Counsel further alleged that Mr. Stiller's conduct was unlawful in that it violated the statutory prohibition on structuring, 31 U.S.C. § 5324(3),[5] as well as 18 U.S.C. § 1001, a general provision that, among other things, makes it a crime to falsify or conceal "a material fact" from an agency of the United States government.

At a hearing on these charges before a hearing committee of the Board, Bar Counsel's principal witness was Fernando Luna. The tape recording of the conversation that he had had with Mr. Stiller was introduced into evidence, and Mr. Luna authenticated a transcript of that recording. Luna also testified that, during the conversation, Mr. Stiller showed him photocopied materials which related that drug money paid to attorneys for legal fees in other cases had been seized from those attorneys.

In addition to his own testimony, Mr. Stiller offered the testimony of two expert witnesses. William Moffitt, a criminal defense attorney and the Director of the National Association of Criminal Defense Lawyers, testified that he knew of no ethical rules that would prohibit acceptance of a large cash fee from a client charged with a crime. Moffitt

also acknowledged, however, that although a lawyer has a duty to inquire as to the source of the cash fee "to the extent that it might affect the client's case," the lawyer also bears the risk that the fee, whether paid in cash or not, may be subject to forfeiture as a result of the Supreme Court decision in *Caplin & Drysdale v. United States*, 491 U.S. 617, 109 S.Ct. 2646, 105 L.Ed.2d 528 (1989).

Mr. Moffitt testified that before January 27, 1987, the effective date of 31 U.S.C. § 5324, it was a common practice among criminal defense lawyers who received substantial cash payments of legal fees to deposit such fees in their bank accounts in amounts of less than $10,000, in order to avoid triggering the bank reporting requirements contained in the Bank Secrecy Act of 1970. At some point in the mid–1980's, Mr. Moffitt became aware that money laundering legislation had been introduced and was being considered in Congress. Moffitt testified nevertheless that during the ninety-day period following January 27, 1987 (the period when Mr. Stiller made the deposits at issue here), a reasonable criminal defense lawyer with a street crime practice who did not regularly receive cash fees in excess of $10,000[6] would not have known of the enactment of 31 U.S.C. § 5324, nor would such an attorney have been aware that the structuring of cash deposits to avoid triggering the bank reporting requirements was now, for the first time, a criminal offense.

Mr. Stiller's other expert witness was Charles Morley, a former IRS special agent and currently the head of an investigative firm in Arlington, Virginia, that advised the

**5.** 31 U.S.C. § 5324 was enacted in October 1986, to take effect in January 1987. At the time Mr. Stiller made his cash bank deposits, section 5324 provided in part:

> No person shall for the purpose of evading the reporting requirements of section 5313(a) with respect to such transaction—
> * * * * *
> (3) structure or assist in structuring, or attempt to structure or assist in structuring, any transaction with one or more domestic financial institutions.

Section 5313 (a) provided in part at that time (and still provides):

> When a domestic financial institution is involved in a transaction for the payment, re-

ceipt, or transfer of United States coins or currency (or other monetary instruments the Secretary of the Treasury prescribes), in an amount, denomination, or amount and denomination, or under circumstances the Secretary prescribes by regulation, the institution and any other participant in the transaction the Secretary may prescribe shall file a report on the transaction at the time and in the way the Secretary prescribes ....

In 1992 Congress amended section 5324 by adding a new subsection (b) and making a few other changes. The existing section 5324 thus became 31 U.S.C. § 5324(a).

**6.** Mr. Stiller testified that he had never before received a cash fee in such a large amount.

United States and other governments on money laundering, the Bank Secrecy Act, and related matters. Morley testified that the anti-structuring provisions of the Money Laundering Control Act of 1986—*i.e.*, 31 U.S.C. § 5324—were virtually unknown to the public at large for a substantial period of time after the law was passed; indeed, the banking industry itself was generally unaware of these provisions.

Mr. Morley said that in his experience the government had always been concerned about whether the targets of a currency law prosecution had actual knowledge that their conduct was a crime. In order to alleviate this concern, the government would usually inform the targeted business or industry of the requirements of the law, allow a substantial time—six months to a year—to pass, and then determine whether violations were still occurring.

On January 11, 1994, while Mr. Stiller's case was still pending before the hearing committee, the Supreme Court issued its decision in *Ratzlaf v. United States,* 510 U.S. 135, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994), which addressed the state of mind required to prove a violation of the anti-structuring law, 31 U.S.C. § 5324(3). The Court held that mere intent to avoid triggering the bank reporting requirement was insufficient; rather, "the Government must prove that the defendant acted with knowledge that his conduct was unlawful." *Id.* at 137, 114 S.Ct. 655.

Shortly after *Ratzlaf* was decided, Bar Counsel withdrew the DR 1–102(A)(3) charge (illegal conduct involving moral turpitude) insofar as it was based on a purported violation of 31 U.S.C. § 5324(3). Bar Counsel continued to press the remaining charges, however, including the allegation that Mr. Stiller's conduct violated 18 U.S.C. § 1001.

The hearing committee issued its findings, conclusions, and recommendation on June 15, 1995. The committee found that Mr. Stiller's conscious effort to defeat the government's interest in obtaining information about the movement of large cash sums was dishonest:

Respondent admits, and we find, that he was aware that filing cash deposits exceeding $10,000 would trigger a reporting requirement of some kind. He also admits, and we find, that it was precisely to avoid that reporting requirement that he broke up the cash into artificial amounts of less than $10,000. The next question is why he wanted to avoid the reporting requirement. We find that the reason he did so was to avoid seizure and forfeiture by the government of his clients' legal fees payable to himself and others, because he feared that the government would try to attach those fees as the proceeds of drug transactions.[7]

The committee concluded that Mr. Stiller had "engage[d] in conduct involving dishonesty" in violation of DR 1–102(A)(4). Although a finding of dishonesty need not be predicated on a violation of criminal law, the committee also concluded that Mr. Stiller's conduct had violated 18 U.S.C. § 1001, an offense with which he had never been charged by the government. The committee found, however, that Mr. Stiller's conduct did not involve moral turpitude.

In its report and recommendation, the Board on Professional Responsibility found that the hearing committee's findings of fact were "fully supported by the evidence" and adopted them as its own. The Board also ruled that the hearing committee was correct in concluding that Mr. Stiller's conduct violated DR 1–102(A)(4)'s prohibition on "conduct involving dishonesty." Finally, the Board held that, given the absence of moral turpitude, it was not required to reach the issue of whether Mr. Stiller had violated 18 U.S.C. § 1001.

## II

■ Bar Counsel charged Mr. Stiller with a violation of DR 1–102(A)(4), which states that "[a] lawyer shall not ... engage in conduct involving dishonesty." "Dishonesty," as used in the disciplinary rules, "encompasses fraudulent, deceitful, or misrepresentative behavior." *In re Shorter,* 570 A.2d 760, 767 (D.C.1990) (footnote omitted). The term, however, is not limited to this type of

---

7. In a footnote the committee added, "We credit his testimony, however, that he was not aware that in 1987 it was a crime to structure bank deposits in that fashion."

behavior; it also "encompasses conduct evincing 'a lack of honesty, probity or integrity in principle; [a] lack of fairness and straightforwardness ....' " *Id.* at 768 (quoting *Tucker v. Lower*, 200 Kan. 1, 4, 434 P.2d 320, 324 (1967)).[8] Courts "usually determine whether acts constitute dishonesty on a case-by-case basis." *In re Hockett*, 303 Or. 150, 159, 734 P.2d 877, 883 (1987). An act may be punishable under the disciplinary rules as conduct involving dishonesty even if it does not violate the criminal law. *In re Minninberg*, 485 A.2d 149, 151 (D.C.1984).

Mr. Stiller does not dispute that he structured his currency transactions to prevent scrutiny by the government of the cash that he deposited in his escrow account. He maintains, however, that there is nothing inherently dishonest about such conduct. He asserts that he was unaware of the anti-structuring statute, that he did not have the requisite state of mind to violate the statute, and that he had no legal obligation to inform the government that he had more cash in his possession. To support these assertions, he relies on the Supreme Court's statements in *Ratzlaf, supra,* that "currency structuring is not inevitably nefarious," 510 U.S. at 144, 114 S.Ct. 655, and that one might engage in currency structuring out of a desire for privacy, or to reduce the chance of a burdensome audit by the IRS, even if one had nothing to hide. *Id.* at 144–146, 114 S.Ct. 655.

The hearing committee found that the reasons behind Mr. Stiller's structuring were dishonest:

> Respondent engaged in structuring because he wanted to reduce the possibility that the government would seize his clients' funds that were being used to pay his legal fees (and others'). He was aware that the government would be interested in, and would assert a right to, those funds because they were "drug money" ... and

he decided to conceal that fact from the government by engaging in structuring. Mr. Stiller points out that this conclusion incorrectly presupposes that he had a duty to disclose his cash fees to the government. He further argues that if his conduct is considered "dishonest," then every criminal defense lawyer who purposefully deposited less than $10,000 in cash legal fees before or after January 1987 is subject to being charged with, and found to have committed, a violation of DR 1–102(A)(4).

Mr. Stiller also maintains that he lacked the requisite state of mind to engage in dishonest conduct. He cites *In re Hutchinson*, 534 A.2d 919, 923 (D.C.1987) (en banc), in which this court stated that "[i]n the absence of affirmative proof of a fraudulent intent or state of mind, [the conduct at issue] did not establish a violation of DR 1–102(A)(4)." He asserts that there is nothing in the record to support a finding that he acted with a dishonest, improper, or fraudulent motive. There were, he says, no "badges of fraud": no use of confederates to make multiple deposits, no multiple banks or accounts, no accounts in false names, no commingling of funds, or the like.

On this point we agree with Mr. Stiller. While it seems clear that his purpose in structuring was to protect his fee, under *Ratzlaf* that fact does not constitute proof of a dishonest or fraudulent state of mind within the meaning of *Hutchinson*. In order for concealment to be dishonest, there must be a duty of disclosure, and none existed here.

In deciding this case, we compare Mr. Stiller's conduct with that of the respondent in *In re Shorter, supra.* That case involved a lawyer who gave "technically true" answers to questions by an IRS agent about his ownership of certain assets and his office-sharing arrangement with another lawyer, but who omitted to mention to the agent that all of his personal expenses were paid by the law firm

---

8. The definition in *Tucker*, which was taken from Webster's Unabridged Dictionary, Third Edition, goes on to include a "disposition to defraud, deceive or betray," language which we did not address in *Shorter*. Most other state courts that have defined "dishonesty" in the context of their disciplinary rules have relied on somewhat similar language which apparently originated in

Black's Law Dictionary: a "disposition to lie, cheat or defraud; untrustworthiness; lack of integrity." *See, e.g., Florida Bar v. Pettie*, 424 So.2d 734, 737 (Fla.1982); *Attorney Grievance Comm'n v. Finnesey*, 283 Md. 541, 545, 391 A.2d 434, 436 (1978); *In re Hockett*, 303 Or. 150, 158, 734 P.2d 877, 882 (1987).

from accounts held solely in the name of his law partner (an arrangement which would have explained to the IRS why he apparently had no assets and almost no income). We held that the lawyer's actions were dishonest and thus violated DR 1–102(A)(4):

> By his own acknowledgment respondent knew what information the IRS was after, but for his own benefit refrained from supplying that information even when asked questions that grazed the truth. As long as the IRS did not ask just the right questions, respondent was prepared to deprive it of the right answers.

*Shorter*, 570 A.2d at 768.

Mr. Stiller, on the other hand, never dissembled for his own benefit. The information on each deposit slip was accurate. To the extent that he could be seen as withholding information (namely, the total amount of cash in his possession), it was not information that the government was entitled to have or that Mr. Stiller had any duty to disclose. Indeed, the Board acknowledges in its report that if Stiller had simply kept the cash in his possession, there would have been no dishonest conduct. Mr. Stiller's behavior may have fallen somewhat short of perfection, but without a duty to disclose, it was not dishonest.

 For these reasons we hold that Mr. Stiller's conduct does not fit within either the definition of dishonesty set forth in *Shorter* (or in the *Tucker* case on which it was based) or the definition derived from Black's Law Dictionary, *supra* note 8, which other states have adopted. It follows that his conduct was not "dishonest" within the meaning of the disciplinary rule.

### III

Bar Counsel originally charged Mr. Stiller with violating DR 1–102(A)(3), which provides that "[a] lawyer shall not engage in illegal conduct involving moral turpitude that adversely reflects on his fitness to practice law." In January 1994 the Supreme Court issued its decision in *Ratzlaf v. United States, supra*, in which it ruled that in order to convict someone of "willfully violating" the

anti-structuring law, "the Government must prove that the defendant acted with knowledge that his conduct was unlawful." 510 U.S. at 137, 114 S.Ct. 655. Shortly after *Ratzlaf* was decided, Bar Counsel withdrew the DR 1–102(A)(3) charge.

At the same time, Bar Counsel has continued to assert before the hearing committee, the Board, and this court that Mr. Stiller's conduct violated 18 U.S.C. § 1001, the general criminal provision that prohibits the concealment of "a material fact" from the government. Before the moral turpitude charge was withdrawn by Bar Counsel, the hearing committee concluded that Mr. Stiller had violated section 1001. In his brief, Bar Counsel maintains that Stiller "violated the statute when he 'caus[ed] the financial institution[] to fail to file the required report,'" citing *United States v. Tobon–Builes*, 706 F.2d 1092, 1098–1099 (11th Cir.1983), and other cases. The Board ruled that it did not have to decide whether Mr. Stiller had violated 18 U.S.C. § 1001 because the moral turpitude charge was no longer pending.

 We reach the same conclusion, but for a more fundamental reason than that given by the Board. We hold that neither the hearing committee nor the Board nor this court is authorized to decide whether Mr. Stiller violated 18 U.S.C. § 1001.[9] Under our legal system, that decision is entrusted exclusively to federal courts and federal juries. Any suggestion by us that Mr. Stiller violated (or did not violate) section 1001 would have no legal force or effect; at best, we would be rendering only an advisory opinion if we even attempted to address the question. If he had been convicted of such a violation, the fact of conviction would of course be relevant to any disciplinary proceeding. *See* D.C.Code § 11–2503(a) (1995) (requiring disbarment when a member of the bar "is *convicted* of an offense involving moral turpitude" (emphasis added)). But absent a conviction, it does not matter for disciplinary purposes whether he violated 18 U.S.C. § 1001 or any other federal criminal statute. The flaw in Bar Counsel's argument is that it

9. Given this holding, we do not reach Mr. Stiller's substantive arguments, set forth principally in his reply brief, on whether he in fact violated 18 U.S.C. § 1001.

focuses on the statute rather than on Mr. Stiller's conduct. Unless section 11–2503(a) is brought into play by an actual conviction, an attorney may be subjected to disciplinary sanctions only for his conduct, not for any supposed violation of a criminal statute with which he has never even been charged.

## IV

We hold that Mr. Stiller's conduct did not involve "dishonesty" within the meaning of DR 1–102(A)(4) and thus did not violate that rule. As to his other disciplinary violations, we adopt the recommendation of the Board, which he does not contest. Accordingly, it is

ORDERED that respondent, Barry C. Stiller, is hereby suspended for one year from the practice of law in the District of Columbia. His suspension shall not be effective until he files the affidavit required by D.C. Bar Rule XI, § 14(g). *See In re Slosberg*, 650 A.2d 1329, 1331 (D.C.1994). His interim suspension shall remain in effect until then. It is

FURTHER ORDERED that, as conditions of reinstatement to membership in the bar, respondent (1) shall demonstrate his fitness to practice law, and (2) shall make restitution to his clients in Bar Docket Nos. 159–89 and 317–92 in the amounts of the fees he received from those clients, with interest at an annual rate of six percent from the dates on which he received those fees.