IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 116,943

In the Matter of HARRY LOUIS NAJIM,
*Respondent*.

ORIGINAL PROCEEDING IN DISCIPLINE

Original proceeding in discipline. Opinion filed December 1, 2017. Indefinite suspension.

*Stanton A. Hazlett*, Disciplinary Administrator, argued the cause and was on the brief for the petitioner.

*Craig Shultz*, of Shultz Law Office, P.A., of Wichita, argued the cause and was on the brief for the respondent, and *Harry Louis Najim*, respondent, argued the cause pro se.

PER CURIAM:  This is an original proceeding in discipline filed by the office of the Disciplinary Administrator against the respondent, Harry Louis Najim, of Wichita, an attorney admitted to the practice of law in Kansas in 1972. Pursuant to a plea agreement, respondent admitted that he provided legal services to an undercover agent who was engaged in a conspiracy to commit wire fraud and contraband cigarette trafficking. The undercover agent paid respondent $16,500 in cash. But respondent did not notify his law firm so it could report the payment to the Financial Crimes Enforcement Network despite his knowing a report of that amount was required by law. Based on that Class D federal felony conviction for violating 31 U.S.C. § 5324(b)(1) (2012) (structuring transactions to evade reporting), a hearing panel of the Kansas Board for Discipline of Attorneys determined that respondent violated Rule 8.4(b) of the Kansas Rules of Professional Conduct (KRPC) (2017 Kan. S. Ct. R. 379) (commission of a criminal act reflecting adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer). The panel

1

majority recommended a three-year suspension from the practice of law effective from the date of this court's decision.

Respondent appeals the finding that he violated KRPC 8.4(b) and the recommended three-year suspension. We hold that respondent violated KRPC 8.4(b) and impose an indefinite suspension that is retroactive to his temporary suspension imposed on May 18, 2015.

On May 16, 2016, the office of the Disciplinary Administrator filed a formal complaint against the respondent alleging violations of the KRPC. The respondent filed an answer on June 10, 2016. A hearing was held on the complaint before a panel of the Kansas Board for Discipline of Attorneys on September 29, 2016, where the respondent was personally present and represented by counsel.

The hearing panel made the following findings of fact and conclusions of law, together with its recommendation to this court:

"*Findings of Fact and Conclusions of Law*

. . . .

"8. On August 13, 2013, a grand jury returned a 44-count indictment in the United States District Court for the Western District of Missouri. The respondent was charged in counts 1 and 44 of the indictment with having violated 18 U.S.C. § 371 (conspiracy to commit offense or to defraud the United States), a Class D felony and 18 U.S.C. § 1956(h) (laundering of monetary instruments), a Class C felony. On August 14, 2013, the respondent, through counsel, reported the charges to the disciplinary administrator.

2

"9. On February 20, 2015, the respondent entered a guilty plea to violating 31 U.S.C. § 5324(b)(1), structuring a transaction to evade reporting, pursuant to a written plea agreement. The plea agreement provided, in pertinent part, as follows:

'Pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, the parties described below have entered into the following plea agreement:

'1. The Parties. The parties to this agreement are the United States Attorney's Office for the Western District of Missouri (otherwise referred to as "the Government" or "the United States"), represented by Tammy Dickinson, United States Attorney, and Paul S. Becker and Justin G. Davids, Assistant United States Attorneys, and the defendant, Harry Najim, represented by Craig Shultz and Michael Shultz.

'The defendant understands and agrees that this plea agreement is only between him and the United States Attorney for the Western District of Missouri and that it does not bind any other federal, state, or local prosecution authority or any other government agency, unless otherwise specified in this agreement.

'2. Defendant's Guilty Plea. The defendant agrees to waive Indictment and plead guilty to Count One of an Information charging him with a violation of 31 U.S.C. § 5324(b)(1), that is, failure to file a report relating to currency in a nonfinancial trade or business. The information setting forth the charge is incorporated by reference herein. By entering into this plea agreement, the defendant admits that he committed this offense, and is in fact guilty of this offense.

'3. Factual Basis for Guilty Plea. The parties agree that the facts constituting the offense to which the defendant is pleading guilty are as follows:

3

'At all times relevant to this Information, defendant Harry Najim was a lawyer employed by the Adam Jones Law Firm in Wichita, Kansas. From March 2011 through January 2012, defendant Najim provided legal services for a person identified to him as "Bill Johnson." Bill Johnson was in fact a Special Agent with the Bureau of Alcohol, Tobacco and Firearms and Explosives working in an undercover capacity. Bill Johnson was engaged in selling large quantities of untaxed cigarettes to a group of individuals who transported the contraband cigarettes to retail outlets in New York State. Those individuals were engaged in a conspiracy to commit wire fraud and contraband cigarette trafficking in violation of 18 U.S.C. §§ 2342 and 1343.

'Defendant Najim provided legal services for Bill Johnson. On June 23, 2011, at the McCormick and Schmick's restaurant on the Country Club Plaza, Kansas City, Missouri, Bill Johnson paid defendant Najim $16,500 in United States Currency for defendant Najim's legal services. Defendant knew the requirements of 31 U.S.C. § 5331 and the regulations implementing that statute which required the law firm to file a report with the Financial Crimes Enforcement Network upon receipt of more than $10,000 in currency in a single transaction. Defendant Najim did not report the receipt of the $16,500 currency to the Adams Jones Law Firm which caused it to fail to file a report with the Financial Crimes Enforcement Network within the time period required by the statute and implementing regulations.

'4.     Use of Factual Admissions.  The defendant acknowledges, understands and agrees that the admissions contained in Paragraph 3 and other portions of this plea agreement will be used for the purpose of determining his guilt and advisory sentencing range under the United States Sentencing Guidelines ("U.S.S.G."), including the calculation of the defendant's offense level in accordance with U.S.S.G. § 1B1.3(a)(2). The defendant acknowledges and understands that other uncharged related criminal activity may be considered as "relevant conduct"

4

pursuant to U.S.S.G. § 1B1.3(a)(2) or part of the "offense of conviction" pursuant to U.S.S.G. § 1B1.2, and may be used by the Court in calculating the offense level for the charge to which he is pleading guilty.

'5.     Statutory Penalties.  Defendant understands that upon his plea of guilty to Count One of the Information charging him with causing the business to fail to file a report required under 31 U.S.C. § 5331, the maximum penalty the Court may impose is not more than five years imprisonment, three years of supervised release, a fine of not more than $250,000; and a $100 mandatory special assessment which must be paid in full at the time of sentencing. The defendant further understands that this offense is a Class D Felony.'

As part of the plea agreement, the parties requested that the court delay formally accepting the respondent's guilty plea for a period of two months. The court agreed and took the respondent's guilty plea under advisement. On April 20, 2015, the federal government filed a motion requesting that the court formally accept the respondent's guilty plea.

"10.     On May 12, 2015, the disciplinary administrator filed a motion with the Kansas Supreme Court for the temporary suspension of the respondent's license to practice law, based upon the respondent's felony conviction of structuring a transaction to evade reporting. On May 18, 2015, the Supreme Court entered an order of temporary suspension.

"11.     On September 30, 2015, the prosecutor filed a sentencing memorandum. The prosecutor's sentencing memorandum included:

'. . . The Presentence Investigation Report (PSR) found the defendant's base offense level was 6, and an eight-level increase because the value of the funds was greater than $70,000. The PSR found that the value of the funds was $74,500. (PSR ¶ 25.) The PSR assessed the following enhancements:

5

- A two-level increase because the defendant knew or believed that the funds were proceeds of unlawful activity, or were intended to promote unlawful activity. U.S.S.G. § 2S1.3(b)(1)(A);

- A two-level increase for obstruction of justice. U.S.S.G. § 3C1.1; and

- The PSR also recommended the defendant not receive a reduction for acceptance of responsibility based upon his conduct resulting in an enhancement for obstructing or impeding the ministration [*sic*] of justice. U.S.S.G. § 3E1.1, comment. (N.4).

'Therefore, the PSR found the defendant's offense level was 18, Criminal History Category I, resulting in a Guidelines range of 27 to 33 months.

'The defendant has filed extensive objections to the PSR's statement of his conduct in the charged offenses and the relevant conduct, the enhancements listed above, and the denial of a reduction for acceptance of responsibility. The Government does not believe that the defendant's conduct in giving money to co-defendant [C.S.] supports an enhancement for obstruction of justice. Therefore, consistent with the plea agreement, the Government believes that the defendant should be given a reduction for acceptance of responsibility. However, the defendant's comments during the plea hearing and the objections submitted to the PSR raises serious questions about whether the defendant has truly "accepted responsibility" for his role in the conspiracy. The Government will introduce evidence at the sentencing hearing which will clearly establish the defendant's conduct in the charged and relevant conduct which supports the enhancement that he

knew the funds were proceeds of unlawful activity. U.S.S.G. § 2S1.3(b)(1)(A).

. . . .

## 'SUMMARY OF THE CASE

### 'Charged Conduct

'The following is the agreed statement of facts from the plea agreement:

'At all times relevant to this Information, defendant Harry Najim was a lawyer employed by the Adam Jones Law Firm in Wichita, Kansas. From March 2011 through January 2012, defendant Najim provided legal services for a person identified to him as "Bill Johnson." Bill Johnson was in fact [] Special Agent [Williamson] with the Bureau of Alcohol, Tobacco and Firearms and Explosives working in an undercover capacity. Bill Johnson was engaged in selling large quantities of untaxed cigarettes to a group of individuals who transported the contraband cigarettes to retail outlets in New York State. Those individuals were engaged in a conspiracy to commit wire fraud and contraband cigarette trafficking in violation of 18 U.S.C. § 2342 and 1343.

'Defendant Najim provided legal services for Bill Johnson. On June 23, 2011, at the McCormick and Schmick's restaurant on the Country Club Plaza, Kansas City, Missouri, Bill Johnson paid defendant Najim $16,500 in United States Currency for defendant Najim's legal services. Defendant knew the requirements of 31 U.S.C. § 5331 and the regulations implementing that statute which required the law firm to file a report with the Financial Crimes Enforcement Network upon receipt of more than $10,000 in currency in a single transaction. Defendant Najim did not report the receipt of the $16,500 currency to the Adams Jones Law Firm which caused it to fail to file a report with the Financial

7

Crimes Enforcement Network within the time period required by the statute and implementing regulations.

'Relevant Conduct

'During all times relevant to this conspiracy, [C.S.] and another person, [J.A.], owned and operated Cheap Tobacco Wholesale (hereinafter CTW), a business located in Independence, Missouri. CTW was a licensed tobacco wholesaler in Missouri. Neither [C.S.] nor CTW was a licensed New York tobacco wholesaler authorized to bring cigarettes into the state of New York. Defendant Harry Najim was [J.A.]'s attorney for many years.

'New York State imposes excise taxes on all cigarettes sold in the state, unless expressly exempted by law or by private agreement between New York State and an Indian nation or tribe (either approved by the legislature or part of a stipulation and order approved by a federal court). Under New York State law, cigarettes can only be transported into the state by a limited number of state-licensed stamping agents (*i.e.* wholesalers). The New York Department of Taxation and Finance pre-collects the cigarette excise tax from these state-licensed stamping agents on cigarettes that are sold to retailers, but prior to their delivery to the retailers. This taxing scheme was upheld as specifically applicable against Indian nations on May 9, 2011, by the United States Court of Appeals for the Second Circuit in *Oneida Nation of New York v. Cuomo*, 645 F.3d 154 (2d Cir. 2011). Federal and New York State law require that tax stamps be affixed to cigarette packages—prior to their delivery to retailers—reflecting that the required state taxes have been paid. During the relevant time period, New York State imposed a cigarette excise tax of $4.35 per pack, or $43.50 per carton.

'In New York State, only licensed wholesalers may purchase unstamped cigarettes. This is done either directly through the cigarette manufacturer

8

or through other wholesalers. Under New York State law, it is the obligation of state-licensed stamping agents to prepay the excise tax and affix stamps on all cigarettes packs. Under New York State and federal law, tobacco wholesalers must report the sales of cigarettes to the state.

'[C.S.] and co-defendant [G.T.] would make regular purchases in Kansas City, Missouri, of contraband cigarettes from undercover agents of the Bureau of Alcohol, Tobacco, Firearms and Explosives in exchange for United States Currency. [T.J.] and [D.B.] would coordinate the orders between [C.S.] and [G.T.]. [G.T.] and [G.B.] would coordinate the cigarette orders from the vendors in New York State—including [W.P.], [T.S.], AJ's and HCID in Nebraska.

'From February 2011 through November 2011, Najim provided advice to [J.A.], [C.S.] and the undercover agent on how to conceal the proceeds of the cigarette trafficking activity. At the sentencing hearing, the Government will present the testimony of Special Agent Williamson, and excerpts from the audio recordings with defendant Najim and the other co-conspirators. The following is a summary of the evidence to be presented to prove by a preponderance of the evidence that defendant Najim was a member of the conspiracy and knew that the cash he received was the proceeds of illegal cigarette trafficking:

- On February 17, 2011, SA Williamson met with [J.A.] and [J.A.] discussed introducing Williamson to [J.A.]'s attorney. [J.A.] stated that Najim knew about tobacco laws and money laundering. (Ex. 100d.)

- On March 10, 2011, SA Williamson talked with [J.A.] concerning the meeting with Harry Najim. [J.A.] told Williamson that he did not hold anything back from Najim. (Ex. 102.)

9

- On March 16, 2011, [J.A.] and SA Williamson met with Najim at Najim's law firm in Wichita, Kansas. In response to Najim's questions, SA Williamson told Najim that he was a "middleman" in the cigarette transactions. Najim asked if he could ship unstamped cigarettes interstate since "I don't think you can do that, I mean, lawfully." Williamson responded "probably not" and [J.A.] stated "he's aware of that." (Ex. 103b).

- Later in that conversation, SA Williamson told Najim that he could not report his income because he could not report the cigarette sales since he was not licensed. Najim responded that when he hears things like that on the telephone, he smashes the phone on the table and says we have a bad connection.

- On April 14, 2011, in a meeting at the Capitol Grill in Kansas City, Missouri, SA Williamson told Najim he had not paid taxes in 10 years. Najim responded "you know when you used to be on the phone, the hand held phone and you pulled like a receiver I had you know we must have a bad connection, 10 years?" (Ex. 109j.)

- During May 2011, Najim set up a corporation for the undercover agent. The agent had requested the corporation be formed in order to buy an airplane without it being traced back to the undercover agent. Najim set up a Missouri corporation, FBNA, Inc., which stood for Fly by Night Airlines.

- In order to purchase the aircraft, [J.A.] gave a cashier's check, payable to FBNA, Inc., for Najim to deliver to the broker selling the airplane. On June 9, 2011, SA Williamson sold [J.A.] 401 cases of cigarettes, including 201 cases of Marlboro cigarettes, for $777,830. The payment was $227,830 in cash and a check for $550,000. SA Williamson held the check for $550,000 pending

the delivery of the airplane. On June 10, 2011, Najim had a telephone conversation with SA Williamson in which Najim informed SA Williamson that FBNA, Inc., owns a plane.

- On June 21, 2011, Najim and SA Williamson had a telephone conversation arranging to meet later in the week. SA Williamson was providing directions to Najim to come to the undercover warehouse. Najim asked if there was a sign on the building and SA Williamson replied "what are you going to advertise, illegal cigarettes?" Najim replied "no, God don't say that . . ." (Ex. 130b.)

- On June 21, 2011, Najim and SA Williamson had another telephone conversation concerning a payment by SA Williamson to Najim. SA Williamson informed Najim that he had $13,500 set aside and Najim responded "can you make it sixteen five and we will be even?"

- On June 23, 2011, Najim and SA Williamson met at McCormick and Schmidt's [*sic*] restaurant in Kansas City, Missouri. In the meeting, SA Williamson handed Najim a FedEx envelope containing $16,500. (Exs. 132b and Ex. 154, photograph, attached.)

- In September 2011, Najim and SA Williamson discussed plans to buy semi tractors using the proceeds from another cigarette transaction. (Ex. 133e.)

- On October 30, 2011, Najim met with SA Williamson and they discussed the purchase of the four trucks with the proceeds of a deal that was scheduled to occur on November 22, 2011. SA Williamson informed Najim that the deal was worth $633,240. SA Williamson told Najim that if he could obtain the four trucks

for less than that, Najim could have the remaining amount. (Ex. 139f.) In that conversation, Najim requested the amount be split with a small check to the firm and the rest being given in cash to Najim.

- On November 22, 2011, SA Williamson met with [C.S.] and transferred to him 258 cases of Marlboro cigarettes and 96 cases of Newport cigarettes. [C.S.] showed SA Williamson a piece of paper outlining the checks and payments for the trucks that were being purchased by Najim. The paper stated that $10,000 had been paid as a deposit, and then three checks were to be issued in the amount of $280,000 and $276,000 for the trucks, and the third check in the amount of $9,000 was to be paid to Najim's law firm. [C.S.] stated he was going to pay the remaining amount of approximately $60,000 to Najim in cash. (Ex. 147d.)

- Between November 17, 2011 and November 23, 2011, Najim purchased four 2012 Peterbilt trucks from [a truck dealer] in Wichita, Kansas. Shortly thereafter, [C.S.] delivered $60,000 in cash to Najim in Wichita.

- Beginning in June 2011 and continuing through the end of 2011, Najim was making arrangements to introduce SA Williamson to a former client who would act as an enforcer for SA Williamson. . . .'

"12.    On October 9, 2015, the respondent, through counsel, filed a sentencing memorandum. The respondent's sentencing memorandum included arguments that his sentence should not be enhanced because he did not know that the funds came from an illegal source.

'The evidence is scant that the money for this transaction was known to be the result of illegal conduct. The conduct for which Mr. Najim stands

12

before this court is straightforward—not advising his law firm of this cash transaction such that it could not file a currency report. And even though Mr. Najim failed to advise them of it, Mr. [J.A.] used the funds to issue a check payable to Mr. Najim's law firm for the legal fees incurred. That payment was recorded on the books of the firm, subjected to proper accounting, and included as income to the firm for federal and state income tax purposes.

. . . .

'Mr. Najim was asked by [J.A.] to assist him in setting up a structure to handle wholesale cigarette transactions and the importation of cigarettes from Eastern Europe. Mr. Najim had nothing to do with any prior actions of [J.A.], [C.S.] or Wes Williamson. Mr. Najim, during the months thereafter, (with normal legal pride) announced that he would try and did indeed find a lawful way to structure the business. That did not satisfy Agent Williamson.

'While isolated pieces of recorded conversations may suggest an appearance of illegality, the totality of conversations suggest otherwise. . . .

'What the government relies upon, namely that Mr. Najim wanted to help violate the law, is unsupported. . . .'

"13.     On October 15, 2015, the respondent appeared before the court for sentencing. After hearing the evidence presented by both sides, the court stated as follows:

'THE COURT: Well, the Court finds that defendant—I believe the government has met their burden. I believe Mr. Najim did know the funds were from unlawful, the proceeds were from unlawful activity. I think this two-level increase is appropriate to apply in this case.'

13

The court ordered the respondent to pay a fine of $3,000 and a fee of $100 and placed the respondent on probation for five years.

"14.     At issue before the hearing panel was whether the respondent knew that the funds he received came from an illegal source. Kan. Sup. Ct. R. 202 addresses the weight to be given to judgments previously entered. Kan. Sup. Ct. R. 202 provides in part:

> 'A certificate of a . . . civil judgment based on clear and convincing
> evidence shall be conclusive evidence of the . . . civil wrong in any
> disciplinary proceeding instituted against said attorney based upon
> the . . . judgment. . . . All other civil judgments shall be prima facie
> evidence of the findings made therein and shall raise a presumption as to
> their validity. The burden shall be on the respondent to disprove the
> findings made in the civil judgment.'

Because the court's decision enhancing the respondent's sentence based on the respondent's knowledge that the funds came from an illegal source was made by a preponderance of the evidence, the burden was on the respondent to disprove the findings made by the sentencing court.

"15.     In his sentencing memorandum, the respondent argued that the government's reliance on pieces of the recorded statements was unfair and that the totality of the conversations suggest otherwise. However, in his sentencing memorandum, before the sentencing court, and before the hearing panel, the respondent failed to point [to] the portions of the recorded statements that refute the evidence advanced by the government in its sentencing memorandum that the respondent knew that the funds were the proceeds from illegal activity. The respondent had access to the recorded statements and failed to put forth portions of the recorded statements to support his arguments.

"16.     Rather, at the hearing on this matter, the respondent attempted to introduce evidence in the form of expert testimony from Jack Focht to 'address[] the weakness of the [government's] evidence and . . . try[] to explain why th[e] evidence,

14

from a lawyer's point of view, understanding what a lawyer would be told, does not prove' that the respondent knew the funds were the proceeds from illegal activity. The hearing panel concluded that expert testimony would invade the province of the hearing panel and did not allow the presentation of the evidence. The hearing panel did not, however, prevent the respondent from presenting evidence of the recorded conversations to refute the evidence advanced by the government.

"17.     After considering all the evidence presented in this case, the hearing panel concludes that the respondent failed to meet his burden. Thus, like the federal district court, the hearing panel concludes that the respondent knew that the funds were the fruits of illegality.

"18.     On May 16, 2016, Mr. Hazlett filed a formal complaint in the instant case. Thereafter, on June 10, 2016, the respondent filed an answer under Kan. Sup. Ct. R. 211(b). In the respondent's answer to the formal complaint, the respondent denied that his conduct violated KRPC 8.4(b). At the hearing on this matter, at the outset of counsel for respondent's closing argument, the respondent clarified that he does admit that his conduct violates KRPC 8.4(b). Based upon the findings of fact and the respondent's stipulation at the time of the hearing, the hearing panel concludes as a matter of law that the respondent violated KRPC 8.4(b), as detailed below.

"KRPC 8.4(b)

"19.     'It is professional misconduct for a lawyer to . . . commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects.' KRPC 8.4(b). In this case, the respondent entered a guilty plea to violating 31 U.S.C. § 5324(b)(1), structuring transactions to evade reporting, a Class D felony. The crime which the respondent was convicted of adversely reflects on the respondent's honesty, trustworthiness, or fitness as a lawyer in other respects. Accordingly, the hearing panel concludes that the respondent violated KRPC 8.4(b).

15

"*American Bar Association*
*Standards for Imposing Lawyer Sanctions*

"20.     In making this recommendation for discipline, the hearing panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"21.     *Duty Violated*.  By engaging in criminal conduct, the respondent violated his duty to [the] public, to the profession, and to the legal system.

"22.     *Mental State*.  The respondent knowingly violated his duties.

"23.     *Injury*.  As a result of the respondent's misconduct, the respondent caused actual serious injury to the legal profession.

"Aggravating and Mitigating Factors

"24.     Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following aggravating factors present:

"25.     *Refusal to Acknowledge Wrongful Nature of Conduct*.  The respondent has repeatedly denied that he knew the funds were the proceeds from unlawful activity. The United States District Court for the Western District of Missouri concluded to the contrary. Additionally, after a review [of] all the evidence presented, the hearing panel likewise concludes that the respondent knew that the funds were the proceeds from unlawful activity. The respondent's refusal to acknowledge this portion of his misconduct is an aggravating factor.

16

"26.    *Substantial Experience in the Practice of Law*.  The Kansas Supreme Court admitted the respondent to practice law in the State of Kansas in 1972. At the time of the misconduct, the respondent has been practicing law for approximately 40 years.

"27.    *Illegal Conduct, Including that Involving the Use of Controlled Substances*.  The respondent was convicted by his plea to a federal felony crime involving dishonesty. The respondent's illegal conduct is an aggravating factor.

"28.    Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following mitigating circumstances present:

"29.    *Absence of a Prior Disciplinary Record*.  The respondent has not previously been disciplined.

"30.    *The Present and Past Attitude of the Attorney as Shown by His or Her Cooperation During the Hearing and His or Her Full and Free Acknowledgment of the Transgressions*.  The respondent fully cooperated with the disciplinary process. Additionally, the respondent admitted the facts that gave rise to the violations.

"31.    *Previous Good Character and Reputation in the Community Including Any Letters from Clients, Friends and Lawyers in Support of the Character and General Reputation of the Attorney*.  The respondent is an active and productive member of the bar of Wichita, Kansas. The respondent also enjoys the respect of his peers and generally possesses a good character and reputation as evidenced by several letters prepared for the sentencing judge and received by the hearing panel.

"32.    *Remorse*.  At the hearing on this matter, the respondent expressed genuine remorse for having engaged in the misconduct.

"33.    In addition to the above-cited factors, the hearing panel has thoroughly examined and considered the following Standards:

17

'5.11  Disbarment is generally appropriate when:

    (a)    a lawyer engages in serious criminal conduct a necessary element of which includes intentional[] interference with the administration of justice, false swearing, misrepresentation, fraud, extortion, misappropriation, or theft; or the sale, distribution or importation of controlled substances; or the intentional killing of another; or an attempt or conspiracy or solicitation of another to commit any of these offenses;

    (b)    a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice.

'5.12  Suspension is generally appropriate when a lawyer knowingly engages in criminal conduct which does not contain the elements listed in Standard 5.11 and that seriously adversely reflects on the lawyer's fitness to practice.'

"*Recommendation*

"34.  The disciplinary administrator recommended that the respondent's license to practice law be suspended for an indefinite period of time. The disciplinary administrator recommended that the suspension be made retroactive to the date of the temporary suspension only if the hearing panel concludes that the respondent did not know the funds were the proceeds from unlawful activity.

"35.  Counsel for the respondent recommended that the respondent's license be suspended for a period for two years and that the suspension be made retroactive to the date of the temporary suspension, May 15, 2015.

18

"36. In considering the appropriate discipline to impose, the hearing panel considered discipline imposed in other Kansas cases where the respondent engaged in criminal conduct. *See In re Frahm*, 291 Kan. 520, 241 P.3d 1010 (2010) (Following a bench trial, the attorney was convicted of driving under the influence of alcohol, reckless driving, leaving the scene of an accident, and two counts of aggravated battery, felony crimes. Later, the convictions for reckless driving and the two counts of aggravated battery were set aside. Even though the felony convictions were set aside, the criminal conduct warranted a three-year suspension.); *In re Minneman*, 287 Kan. 477, 196 P.3d 1156 (2008) (Attorney disbarred for conspiring with a client to hide over $700,000 of the client's income from the Internal Revenue Service over a period of years, which resulted in attorney's federal conviction for conspiracy to commit income tax fraud.); and *In re Laskowski*, 282 Kan. 710, 147 P.3d 135 (2006) (Indefinite suspension was appropriate discipline for conviction of felony driving under the influence of alcohol.).

"37. Additionally, the hearing panel looked to attorney disciplinary cases from other states where the respondent had been convicted of structuring transactions to evade reporting requirements and other similar cases for guidance. *See In re Cozza*, 241 A.D.2d 223 (N.Y. 1998) (two-year suspension); *In re Wintroub*, 277 Neb. 787, 765 N.W.2d 482 (2009) (disbarment); *In re DeRose*, 55 P.3d 126 (Colo. 2002) (disbarment); *Disciplinary Counsel v. Bennett*, 921 N.E.2d 1064 (Ohio 2010) (one-year suspension); *In re Stiller*, 725 A.2d 533 (D.C. 1999) (one-year suspension); and *In re Vanderveen*, 166 Wash.2d 594, 211 P.3d 1008 (2009) (three-year suspension).

"38. After considering all the evidence presented, a majority of the hearing panel recommends that the respondent's license be suspended for a period of three years from the date of the Supreme Court's opinion. By way of explanation, the hearing panel did not recommend an indefinite suspension because the hearing panel does not find any reason to recommend a reinstatement hearing. Finally, the hearing panel concludes that insufficient mitigating evidence was presented to warrant a recommendation that the suspension be made retroactive to the date of the temporary suspension.

"39. Costs are assessed against the respondent in an amount to be certified by the Office of the Disciplinary Administrator.

19

"40.     While I concur with the findings of fact, the conclusions of law, and the recitation of aggravating and mitigating circumstances, I respectfully dissent from the recommendation made by a majority of the hearing panel.

"41.     After reviewing prior cases, both in Kansas, and throughout the United States, I recommend that the respondent be suspended for an indefinite period of time. I further recommend that at the respondent's reinstatement hearing, assuming the respondent remains on federal criminal probation, the respondent present a plan for supervised disciplinary probation. If the reinstatement hearing panel concludes that the respondent should be reinstated, I recommend that he be reinstated subject to supervised disciplinary probation until such time as he is released from federal criminal probation. Finally, assuming the respondent remains compliant with the supervised disciplinary probation, once the respondent has been successfully discharged from federal criminal probation, I recommend that he also be released from supervised disciplinary probation."

## DISCUSSION

Respondent appeals the hearing panel's findings (1) he violated KRPC 8.4(b) and (2) of the existence of one of the aggravating factors relevant to discipline, i.e., that he knew the $16,500 he received were proceeds of unlawful activity.

In a disciplinary proceeding, this court considers the evidence, the findings of the disciplinary panel, and the arguments of the parties and determines whether violations of KRPC exist and, if they do, what discipline should be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Foster*, 292 Kan. 940, 945, 258 P.3d 375 (2011); see Supreme Court Rule 211(f) (2017 Kan. S. Ct. R. 251). "Clear and convincing evidence is 'evidence that causes the factfinder to believe that "the truth

of the facts asserted is highly probable."'" *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009) (quoting *In re Dennis*, 286 Kan. 708, 725, 188 P.3d 1 [2008]).

Unlike the standard for proving attorney misconduct, the panel does not need to support aggravating and mitigating circumstances with clear and convincing evidence. But "some evidence of those circumstances still must be presented for weighing." *In re Hall*, 304 Kan. 999, 1014, 377 P.3d 1149 (2016).

*Did respondent violate KRPC 8.4(b)?*

Under KRPC 8.4(b), it is professional misconduct to "commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects."

The hearing panel concluded respondent violated KRPC 8.4(b) based on his conviction in the federal criminal case. Respondent pled guilty to violating 31 U.S.C. § 5324(b)(1), which states:

> "No person shall, for the purpose of evading the report requirements of section 5331 or any regulation prescribed under such section:
>
> > (1) cause or attempt to cause a nonfinancial trade or business to fail to file a report required under section 5331 or any regulation prescribed under such section."

Respondent advances three arguments for why the panel erred when it ruled he violated KRPC 8.4(b).

Respondent disputes whether he committed a crime at all. But a record of the criminal judgment was admitted into evidence during the disciplinary hearing. And under Supreme Court Rule 202 (2017 Kan. S. Ct. R. 233), the criminal judgment is conclusive evidence in a disciplinary proceeding of the crime's commission. Rule 202 states: "A certificate of a conviction of an attorney for any crime . . . based on clear and convincing evidence shall be conclusive evidence of the commission of that crime or civil wrong in any disciplinary proceeding instituted against said attorney based upon the conviction or judgment." See also *In re Minneman*, 287 Kan. 477, 483, 196 P.3d 1156 (2008) ("'Supreme Court Rule 202 and Kansas precedent do not permit us to look behind [a respondent's] convictions.'").

Next, respondent argues the hearing panel improperly characterized his criminal conviction as "structuring a transaction to evade reporting." He argues the panel instead should have characterized the offense as the "failure to file a report" based on another element of the statute. But the crime to which respondent pled, 31 U.S.C. § 5324(b)(1), plainly requires that a person fail to file a report for "the purpose of evading the report requirements of section 5331 or any regulation prescribed under such section." Accordingly, the panel properly characterized respondent's crime.

Finally, respondent argues that commission of a crime prohibited by 31 U.S.C. § 5324(b)(1) does not amount to a violation of KRPC 8.4(b) because the crime does not involve honesty, trustworthiness, or fitness as a lawyer. He argues the comments to the rule suggest that only crimes involving moral turpitude qualify, and 31 U.S.C. § 5324(b)(1) does not involve such conduct. The comment states:

> "Many kinds of illegal conduct reflect adversely on fitness to practice law, such as offenses involving fraud and the offense of willful failure to file an income tax return. However, some kinds of offenses carry no such implication. Traditionally, the distinction was drawn in terms of offenses involving 'moral turpitude.' That concept can be

22

construed to include offenses concerning some matters of personal morality, such as adultery and comparable offenses that have no specific connection to fitness for the practice of law. Although a lawyer is personally answerable to the entire criminal law, a lawyer should be professionally answerable only for offenses that indicate lack of those characteristics relevant to law practice. Offenses involving violence, dishonesty, or breach of trust, or serious interference with the administration of justice are in that category. A pattern of repeated offenses, even ones of minor significance when considered separately, can indicate indifference to legal obligation." KRPC 8.4, Comment 2.

We also reject this argument. The crime to which respondent pled guilty involved dishonesty because it requires evasion of a reporting requirement. Evasion is defined as "endeavoring to set aside truth or to escape the punishment of the law." Black's Law Dictionary, 554 (6th ed. 1990). By analogy, tax evasion is defined as "the willful attempt to defeat or circumvent the tax law in order to illegally reduce one's tax liability." Black's Law Dictionary 1690 (10th ed. 2014).

Other courts have held that violating 31 U.S.C. § 5324 constitutes a violation of that state's equivalent to KRPC 8.4. See *In re Bronson*, 204 N.J. 173, 7 A.3d 777 (2010) (violation of 31 U.S.C. § 5324[a][3] and [d][1] constitutes violation of RPC 8.4[b], i.e., criminal act that reflects adversely on a lawyer's honesty, trustworthiness, or fitness as a lawyer); *People v. DeRose*, 35 P.3d 708 (Colo. 2001) (violation of 31 U.S.C. § 5324[a][3] by aiding and abetting client to structure financial transactions to avoid mandatory financial reporting requirements imposed upon financial institutions violates RPC 8.4[b]). The same conclusion is appropriate in respondent's case.

Accordingly, we conclude clear and convincing evidence supports the hearing panel's determination that respondent violated KRPC 8.4(b). See *In re Lober*, 288 Kan. at 505 (Clear and convincing evidence is "'evidence that causes the factfinder to believe that

23

"the truth of the facts asserted is highly probable."'"). We therefore expressly reject respondent's argument that the panel "cherry picked" the evidence to reach its decision.

ISSUES OF DISCIPLINE

At the hearing, the Disciplinary Administrator recommended respondent's indefinite suspension from the practice of law. He further recommended that the suspension be made retroactive to the date of respondent's temporary suspension—May 18, 2015—only if the hearing panel concluded he did not know the funds were the proceeds from unlawful activity. In contrast, respondent requested a two-year suspension made retroactive to the date of the temporary suspension. A majority of the hearing panel recommended a three-year suspension from the date of this court's decision.

When determining appropriate discipline, the panel's recommendation is advisory only and does not prevent this court from imposing a greater or lesser punishment. This court and disciplinary panels have historically turned to the ABA Standards for Imposing Lawyer Sanctions for guidance. ABA Standard § 3.0 provides four factors to consider in assessing punishment: (1) the ethical duty violated by the lawyer; (2) the lawyer's mental state; (3) the actual or potential injury resulting from the misconduct; and (4) the existence of aggravating and mitigating circumstances.

The panel concluded that respondent knowingly violated his duty to the public, profession, and the legal system by engaging in criminal conduct. It also concluded the misconduct caused actual serious injury to the legal profession. The panel found the following aggravating circumstances: (1) refusal to acknowledge wrongful nature of conduct; (2) substantial experience in the practice of law; and (3) illegal conduct. And the panel found the following mitigating circumstances: (1) absence of prior disciplinary record; (2) present and past attitude of cooperation during the hearing and admission of

24

facts that gave rise to violations; (3) previous good character and reputation in the community; and (4) remorse for having engaged in misconduct.

On appeal, the majority of respondent's issues concern one of the aggravating factors found by the panel—his refusal to acknowledge the wrongful nature of the conduct. This finding was based on respondent's denial that he knew the funds were proceeds of unlawful activity. We assume without deciding this factor was not present because even without it—when considering the remaining aggravators and the mitigators—respondent's indefinite suspension from the practice of law is otherwise warranted. See *In re Hall*, 304 Kan. 999, 1014, 377 P.3d 1149 (2016) (aggravating and mitigating circumstances need not be supported by clear and convincing evidence but merely presented for weighing). The indefinite suspension is retroactive to the May 18, 2015, order of temporary suspension. Respondent is required to undergo a reinstatement hearing pursuant to Supreme Court Rule 219 (2017 Kan. S. Ct. R. 263).

We have held that "while prior cases may have some effect on the decision of this court with reference to sanctions imposed, the outcomes of prior decisions must give way to this court's consideration of the unique circumstances presented in an individual case." *In re Busch*, 287 Kan. 80, 87, 194 P.3d 12 (2008). Although we do consider respondent's individual case, we also may turn to these other cases for some guidance, i.e., they may provide supportive, but not conclusive, authority.

With that acknowledgment in mind, we note a five-year suspension—with credit for time served while on temporary suspension—was ordered for an attorney who, like respondent, pled guilty to violating 31 U.S.C. § 5324 for unlawfully structuring financial transactions. See *In re Bronson*, 204 N.J. 173 (conviction violates RPC 8.4[b], i.e., a criminal act that reflects adversely on a lawyers' honesty, trustworthiness, or fitness as a lawyer); see also *Disciplinary Counsel v. Bennett*, 124 Ohio St. 3d 314, 921 N.E.2d 1064

25

(2010) (indefinite suspension but credit for time served under temporary suspension order; guilty plea to felony under 31 U.S.C. § 5324[a][3] and [d][2] for unlawfully structuring financial transactions violated the disciplinary rule that proscribed engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation).

CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that Harry Louis Najim be and is hereby indefinitely suspended from the practice of law in accordance with Supreme Court Rule 203(a)(2) (2017 Kan. S. Ct. R. 234). The suspension shall be retroactive to the May 18, 2015, order of temporary suspension and continue thereafter until reinstatement shall be ordered pursuant to Supreme Court Rule 219.

IT IS FURTHER ORDERED that respondent comply with Supreme Court Rule 218 (2017 Kan. S. Ct. R. 262).

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to the respondent and that this decision be published in the official Kansas Reports.

BEIER, J., not participating.
MICHAEL J. MALONE, Senior Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:** Senior Judge Malone was appointed to hear case No. 116,943 vice Justice Beier under the authority vested in the Supreme Court by K.S.A. 20-2616.

26

* * *

STEGALL, J., concurring:  I take the unusual step of writing separately in a disciplinary matter because I am troubled by the hearing panel's apparent disregard of respondent's due process rights. See *State v. Caenen*, 235 Kan. 451, 458-59, 681 P.2d 639 (1984) (recognizing that due process protections apply in attorney discipline proceedings); *In re Daugherty*, 277 Kan. 257, 261, 83 P.3d 789 (2004) (same). During respondent's sentencing in the underlying criminal case, the court made a finding that "Mr. Najim did know the funds were from . . . unlawful activity." Panel Majority Report, at ¶ 13. The panel then relied on Supreme Court Rule 202 (2017 Kan. S. Ct. R. 233) to relieve the Disciplinary Administrator of his burden to demonstrate this fact and instead shifted the burden to respondent to "disprove the findings made by the sentencing court." Panel Majority Report, at ¶ 14.

But on its face Rule 202 plainly and clearly applies only to civil judgments. This finding was not a civil judgment, as everyone acknowledges. Instead, the panel reasoned that because the criminal sentencing court had made its findings under a "preponderance of the evidence" standard, Rule 202 could apply. But while this may make some sense as a matter of policy, it is not what the rule says. In fact, the panel chose to ignore the plain meaning of the rule so as to short-cut the disciplinary process—a process that requires the government to prove its allegations before it deprives an individual of a protected property interest. There is no justification for this when a respondent's license and livelihood hangs in the balance.

Moreover, the panel's creative application of our rule was unnecessary to its conclusions and recommendations. Even without this aggravating factor—which our decision assumes away—the evidence below supports our finding that respondent violated Rule 8.4; and the nature of his conduct justifies the discipline meted out. For this reason alone, I concur with and join fully the decision of the court.

27